IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :   CRIMINAL ACTION
                         :
       v.                 :
                         :
MICKAL KAMUVAKA, et al.     :   No. 09-294-ALL

<u>MEMORANDUM</u>

Dalzell, J.                               June 7, 2010

       It became apparent from the record adduced in this criminal health care fraud prosecution that there were difficult questions regarding restitution that inevitably would arise at the sentencings of the nine defendants who either pleaded guilty or were convicted after the month-long jury trial on March 3, 2010. These complexities focused primarily on two issues. The first is whether the City of Philadelphia should be regarded as a "victim" under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. The second involves the calculus of the amount of restitution that should be ordered from the over-$3.6 million the City paid to the private provider whose four principals and five social workers were adjudicated guilty.

       As will be seen, although the City is a public entity, it is by no means certain that, given the record in this case, it should reflexively be regarded as a "victim" under the MVRA. In

fact, the four defendants who contested the charges contend that the City should <u>not</u> be regarded as such a "victim", and that, in any event, the amount of restitution is unascertainable and therefore should not be imposed upon them.

As the first question is one that has received little attention in the MVRA jurisprudence, we shall analyze it at some length.  The second question is more easily disposed of.

Background

On April 30, 2009, a Grand Jury returned an Indictment that in twenty-one counts charged eight defendants with multiple counts of wire fraud, in violation of 18 U.S.C. § 1343, and health care fraud, in violation of 18 U.S.C. § 1347.  In addition, these eight defendants were also charged with conspiracy to impede, obstruct and influence the investigation of a matter within the jurisdiction of the United States Department of Health and Human Services ("HHS"), in violation of 18 U.S.C. § 1519, which was, in turn, a violation of 18 U.S.C. § 371.  One of these eight defendants, Mariam Coulibaly, was also charged with making materially false statements, in violation of 18 U.S.C. § 1001.  A ninth defendant, Patricia Burch, was charged only with one count of perjury, in violation of 18 U.S.C. § 1623.

These nine defendants were all officers or employees of a firm known as Multi-Ethnic Behavioral Health, Inc. ("MEBH"), a non-profit entity that was formed to contract with the Philadelphia Department of Human Services ("DHS") to provide what are known as "Services to Children in Their Own Homes" ("SCOH"). Such services are extended to "at risk" children in the City of Philadelphia. Ninety-five percent of the funds the City used to pay SCOH providers came from a federal program that exists to provide Temporary Assistance to Needy Families (the "TANF program"). The Commonwealth of Pennsylvania each year at issue received millions of dollars in federal funds as part of the TANF program and the Commonwealth, in turn, allocated these funds to counties such as Philadelphia.

In the summer of 2000, largely through the efforts of defendant Earle McNeill, MEBH, a start-up company, won the contract from DHS to provide SCOH services. MEBH was co-founded by McNeill and defendants Mickal Kamuvaka, Solomon Manamela and Manuelita Buenaflor. MEBH's contract with DHS lasted over six years, until its termination on October 31, 2006. Defendants Julius Juma Murray, Mariam Coulibaly, Christiana Nimpson, Sotheary Chan and Patricia Burch were SCOH workers at MEBH at various times from about November of 2001 through the termination

of MEBH's contract in October of 2006.

This prosecution was triggered when HHS Agent William McDonald read in the _Philadelphia Inquirer_ about the appalling circumstances leading to the August 4, 2006 death of Danieal Kelly, a fourteen-year-old child with cerebral palsy who was first brought to DHS's attention as an "at risk" child in 2002. In September of 2005, DHS assigned the Kelly family to MEBH at the highest level of SCOH supervision -- known as "Level III" -- which required at least two in-person visits per week to assure the welfare of the several Kelly children, most notably, Danieal, who was palpably in extreme need and wheelchair-bound.

When Danieal's dead body was found in horrific condition on August 4, 2006, MEBH's staff, led by Kamuvaka, began furious efforts to cover up the fact that MEBH's SCOH workers had failed to visit the Kelly family. Worse, on the day Kamuvaka learned of the child's death, they energetically fabricated dozens of papers purporting to document visits to the Kelly family that never occurred.

As noted, Agent McDonald learned of the institutional fiasco leading to Ms. Kelly's horrid death only after reading articles about it in the _Philadelphia Inquirer_. Notably, DHS did not bring the matter to his or HHS's attention.

After the Grand Jury on April 30, 2009 returned the Indictment here, five of the defendants pled guilty to some of the charges. Specifically, co-founder Earle McNeill pled guilty to one count of wire fraud, and co-founder Manuelita Buenaflor pled guilty to one count of wire fraud, one of health care fraud, and one of conspiracy as detailed above. SCOH worker Christiana Nimpson pled guilty to the same charges as Manualita Buenaflor. SCOH worker Sotheary Chan pled guilty to one count of wire fraud and one of health care fraud, and SCOH worker Patricia Burch pled guilty to the one count of perjury that she was charged with in the Indictment. We shall refer to these people as the "Plea Defendants".

Defendants Kamuvaka, Manamela, Murray, and Coulibaly contested the charges. On March 3, 2010, Kamuvaka and Manamela were convicted of all the charges against them, and defendants Murray and Coulibaly were convicted of most of the counts against them. We shall refer to these four as the "Trial Defendants".

As the trial progressed, it became apparent to us from the evidence that the City of Philadelphia, through DHS, was no ordinary "victim" within the meaning of the MVRA. As Kamuvaka's able counsel argued to the jury, there was plenty of blame to be found for Danieal's grotesque demise, starting with her mother,

Andrea Kelly, who now serves a twenty to forty year prison
sentence for her wanton neglect. And there can be no question
that defense counsel's generalization includes the abject
institutional failure of DHS in its (at best) supine indifference
to this young victim. We therefore on March 4, 2010 posed three
questions in an Order to all the parties in anticipation of the
sentencings that commenced in April of this year.

The first question asked whether the City could indeed
be a "victim of the offense" with the meaning of the MVRA. As we
explained in footnote one of that Order,

This question is predicated on the record of
the recent trial in which it was disclosed,
inter alia, that:

(a) DHS retained Multi-Ethnic Behavioral
Health, Inc.("MEBH"), which at the time was a
start-up company with no experience in
serving "at risk" children, and which,
throughout the period, appeared to have only
one client, DHS;
(b) DHS maintained a so-called "audit"
program wherein MEBH received up to six
weeks' advance notice of such "audits" and
also received advance identification, albeit
on shorter notice, of the particular families
to be "audited";
(c) The Assistant Medical Examiner's
testimony regarding the directive, unique in
the Assistant Medical Examiner's experience,
from the then-Acting Health Commissioner,
that the doctor should "say nothing" about
his autopsy of Danieal Kelly "to inquiring
people"; and

> (d) The testimony of Agent William McDonald
> that he learned of MEBH's involvement with
> the Kelly family from reading the
> <u>Philadelphia Inquirer</u> and not from any
> disclosure to him or his agency from DHS.

Mar. 4, 2010 Order at ¶ 1, n.1 (doc. no. 228).

We then asked that if the City was indeed a "victim" within the meaning of the MVRA, "should the City nevertheless not be regarded as a 'victim' based on the applicability of other legal grounds?". <u>Id.</u> at ¶ 2. To this question we appended another footnote:

> For example, whether under the circumstances
> suggested in note 1, treating the City as a
> "victim" would be inconsistent with
> Congressional intent under the restitution
> statute or whether such treatment would be
> inconsistent with doctrines of, <u>e.g.</u>, unclean
> hands and <u>in</u> <u>pari</u> <u>delecto</u>, particularly
> where, as here, it is undisputed that the
> funds misused ultimately came from HHS
> through its TANF program.

<u>Id.</u> at ¶ 2, n.2.

Lastly, we asked, "[i]n any case, what is the proper amount of restitution that should be imposed?". <u>Id.</u> at ¶ 3. Again, we provided an explanatory footnote:

> This question is predicated on the divergence
> in the record regarding the extent of phantom
> visits to the "at risk" children and
> families. For example, while he was a SCOH
> worker, it appears that Alan Speed duly
> visited the Kelly family consistent with that

7

family's Level III classification, but that after his involvement ceased these visits did not occur with any regularity. Additionally, former SCOH workers' testimony varied in percentages of phantom visits from twenty percent to more than fifty percent. Thus, it would appear that the "harm" for purposes of restitution -- whether suffered by the City of Philadelphia or by HHS as surrogate for "the families and children at risk" referred to in ¶ 25 on page 7 of the Indictment should be less than the $3,650,145.36 that Michael Kauffman testified the City paid to MEBH during the "scheme".

Id. at ¶ 3, n.3.

The Government filed a Memorandum in response to that Order (doc. no. 242) and the Trial Defendants thereafter filed their Joint Defense Response (doc. no. 292).

Upon further review of the record, we noted the July 15, 2009 guilty plea of DHS social worker Laura Sommerer in the Philadelphia Court of Common Pleas to endangering the welfare of children, in particular, Danieal Kelly, in violation of 18 Pa. C.S.A. § 4304. Sommerer was the second DHS social worker assigned to oversee the Kelly family.[1] As a result, on May 3, 2010, we ordered further briefing on the significance of Sommerer's admission to this crime which, under Pennsylvania law,

---

[1] The first DHS overseer social worker assigned to the family was Dana Poindexter. He is contesting the charges against him in the state prosecution, referred to in the next footnote.

consists of

> "each of the following elements:
> 1) the accused is aware of his/her duty to
> protect the child;
> 2) the accused is aware that the child is in
> circumstances that could threaten the child's
> physical or psychological welfare; and 3) the
> accused has either failed to act or has taken
> action so lame or meager that such actions
> cannot reasonably be expected to protect the
> child's welfare," <u>Commonwealth v. Mackert</u>,
> 781 A.2d 178, 187 (Pa. Super. 2001),
> <u>abrogation on other grounds recognized by</u>
> <u>Commonwealth v. Dent</u>, 837 A.2d 571, 588 (Pa.
> Super. 2003).[2]

Order of May 3, 2010 (doc. no. 293).  The Government duly

responded on May 24, 2010 (doc. no. 303), and the Trial

Defendants did so shortly thereafter (doc. nos. 304 and 305)

---

[2] An excerpt from Sommerer's guilty plea transcript, in
which she assents to the Commonwealth's summary of the evidence
against her, is attached hereto as an Appendix.  We do so because
these admissions unquestionably bear the sufficient indicia of
reliability needed for federal sentencing purposes.  It should
also be noted that in the Presentment <u>In Re: County Investigating</u>
<u>Grand Jury XXII</u>, Misc. No. 0003211-2007, C-5, Court of Common
Pleas of Philadelphia County -- available at
<u>http://www.phila.gov/districtattorney/pdfs/Presentment-DHS.pdf</u>
(hereinafter "Presentment") -- there are recommended charges
against former DHS social worker Dana Poindexter for the same
crime as well as recklessly endangering another person, in
violation of 18 Pa. C.S.A. § 2705, and perjury, in violation of
18 Pa. C.S.A. § 4902.  The same Presentment recommends charges
against Julius Juma Murray and Mickal Kamuvaka for, among other
things, involuntary manslaughter in violation of 18 Pa. C.S.A. §
2504.  The state trial of these defendants is not scheduled to
commence until November 29, 2010.

("Defs' Jt. Resp.").

While the Government agrees with "the Court's concern about the City's failure to assure that MEBH was delivering services and its failure to detect MEBH's fraud," it nevertheless "believes that the City is entitled to restitution despite its own failings and the misconduct of some of its employees." Gov't Mem. Per Order of Mar. 4, 2010 ("Gov't's First Mem.") at 2. By contrast, the Trial Defendants' joint response contends that the City's conduct through DHS was sufficiently "unconscionable, inequitable, or the like" as to preclude its being regarded as an MVRA "victim", essentially applying the doctrine of unclean hands to the City in this context. Defs' Jt. Resp. at 4.

With respect to the amount of restitution, the Government acknowledges that "[l]oss in this case is not easily calculated." Gov't's First Mem. at 10. After canvassing the trial testimony of more than a dozen former SCOH workers who worked at MEBH, the Government concludes that "as a conservative estimate, the Court should estimate that 1/3 of the visits MEBH was required to do were not done." Id. at 13. Thus, the loss -- i.e., the public money paid for services not rendered -- would be a third of the $3.65 million the City remitted to MEBH, or $1,216,000.

On this issue, the defendants have sharply divided. At the sentencings of the five Plea Defendants, no one took issue with the Government's calculus of this restitution. The Judgments for these defendants -- at least for those Plea Defendants like Buenaflor and McNeill who were active and on the scene throughout the conspiracy -- accordingly imposed a $1,216,000 joint and several restitution obligation.

Of greater interest is that, perhaps in recognition of the concerns described in our March 4, 2010 Order, the Government has entered into an agreement with the City of Philadelphia in which "DHS agrees to assign its approximately 1% interest in any restitution payments, along with the federal government's portion, to the Crime Victim's Fund.  See 18 U.S.C. § 3664(g)(2)."  Ltr. from Christopher A. Iacono, Esq. to AUSA Bea L. Witzleben, Apr. 7, 2010, Att. A of Gov't's First Mem.  By the time of the April sentencings of the Plea Defendants, the Government had also reached an agreement with the Commonwealth of Pennsylvania that it, too, would assign its four percent interest in any restitution payments to the Crime Victims Fund maintained in the United States Treasury.[3]

_____

[3] Congress established this Fund in 1984 pursuant to the Victims of Crime Act of 1984, Pub. L. No. 98-473, 98 Stat. 2170-

Thus, with the City's and Commonwealth's agreement, the questions we raised in our March 4, 2010 Order have been compromised, or, if one prefers, finessed. But in view of the Trial Defendants' vigorous opposition to treating the City as an MVRA victim, the issue is still very much alive as far as they are concerned. That is to say, if the City is not an MVRA victim, it has, from the Trial Defendants' point of view, nothing to assign to the Crime Victims Fund. As to the question of "loss" -- to whatever MVRA victim -- the Trial Defendants believe the Government's calculus is too speculative and therefore should not be imposed on them at all.

We therefore address this issue in advance of the Trial Defendants' sentencings later this week.

Can the City Be Regarded as an MVRA "Victim"?

The Government and the Trial Defendants do agree on one point, and that is the breadth of the MVRA's definition of "victim". Specifically, the statute defines a victim as "a person directly and proximately harmed as a result of the

_____

75 (codified as amended at 42 U.S.C. §§ 10601-10605 and in scat-
tered sections of 18 U.S.C.). As the Government puts it, this
fund "provides funding to state and local crime victims compen-
sation and service programs." Gov't's First Mem. at 1, n.1.

commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity [for which all of the Trial Defendants were indeed convicted], any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern," 18 U.S.C. § 3663A(a)(2). In construing this restitution statute, we bear in mind the persuasive teaching of the Seventh Circuit that federal criminal restitution law carries "not a history marked by steady congressional erosion, but rather by constant expansion of the restitution remedy." United States v. Martin, 128 F.3d 1188, 1190 (7th Cir. 1997). The Trial Defendants correctly point out that the Second Circuit has held that governmental entities, including the Government itself, may be considered MVRA "victims", United States v. Ekanem, 383 F.3d 40, 43 (2d Cir. 2004), an unsurprising holding in view of the "constant expansion" that Martin describes. See also United States v. Kress, 944 F.2d. 155, 159-60 (3d Cir. 1991) (Dept. of Defense as victim under pre-MVRA restitution statute).

There is no controversy that the City treasury in fact remitted $3,650,145.36 to MEBH during the over six years of its contract with DHS. To be sure, $3,467,638 (i.e., 95%) came from

13

TANF funds, and $146,006 (<u>i.e.</u>, 4%) came from Commonwealth funds.

But $36,501.45 (<u>i.e.</u>, 1%) came from the City itself, and thus the

City was, even to this narrow extent, "directly and proximately

harmed" by all the defendants and "directly harmed" by the Trial

Defendants.

In sum, there is no dispute that a municipality in

general, and the City of Philadelphia in particular, <u>can</u> be

regarded as a "victim" within the black letter definition of this

statute.  But this generalization by no means resolves the issue

the Trial Defendants press.

The Trial Defendants contend that notwithstanding the

legal reality that municipalities can be MVRA "victims", the City

nevertheless should not receive the grace of the MVRA's breadth

because of equitable doctrines of unclean hands and

unconscionability.  Citing federal and Pennsylvania

jurisprudence, they contend with force that:

> The doctrine of "unclean hands" bars relief
> to those responsible for improper conduct in
> the matter in which they seek relief.  This
> doctrine is designed to protect the integrity
> of the court.  The underlying principle
> supporting the doctrine is that equity will
> not absolve parties <u>in</u> <u>pari</u> <u>delicto</u>.
> Essentially, equity requires that one party
> cannot secure relief against another, when
> both are responsible for improper conduct.
> Where the fault is mutual, the law will leave

14

the case as it finds it.

Defs' Jt. Resp. at 3 (citing Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, 322 F.3d 147 (2d Cir. 2003), and Wishnefsky v. Riley and Fanelli, P.C., 799 A.2d 827 (Pa. Super. 2002)).[4]

The Trial Defendants' position has powerful support in this record. For example, we cited four instances of evidence developed during the trial in this matter that illustrated that many City officials' hands were unclean in DHS's (at best) indifferent supervision of MEBH, which led to Danieal Kelly's grisly demise. As we pointed out in our recent Memorandum in Earle McNeill's sentencing, United States v. McNeill, No. 09-294-3, 2010 WL 1644495 (E.D. Pa. Apr. 23, 2010), McNeill was, by whatever magic, indeed able to win the SCOH contract for MEBH in the summer of 2000, notwithstanding the reality that MEBH had no experience whatever in dealing with "at risk" children. Its principals had largely spent their professional lives dealing

---

[4] The MVRA's burden allocation scheme in 18 U.S.C. § 3664(e) would seem to make this question one of the "other matters" to which Congress entrusts burden assignment to "the court as justice requires." But we have found no jurisprudence squarely addressing anything close to what the Trial Defendants press here. As the following analysis will show, little depends upon our allocation, but we will assume the burden falls on the Government.

with adults with addiction problems.  Notably, there is no record

of MEBH having any client other than DHS during the over six

years at issue.

It also became apparent, particularly at the sentencing

of Manuelita Buenaflor, that McNeill's bond with the City and DHS

was so strong that no ordinary whistleblower was likely to sunder

it.  Even after the horror of Danieal Kelly's death was exposed,

McNeill was twice welcomed at meetings with then-DHS Commissioner

Cheryl Ransom-Garner.  At the second meeting, McNeill,

accompanied by a political patron, without embarrassment sought

not only a "hand slap", but actually asked to extend MEBH's

contract with DHS.  See McNeill at *2-*3.

In short, it was with these realities in mind that at

the April sentencings we cited to the Government Lincoln

Steffens's famous article, "Philadelphia: Corrupt and Contented".

Lincoln Steffens, McLures Magazine, July 1903, available at

http://explorepahistory.com/odocument.php?docId=691.  It did not

escape our attention that, in the Government's Memorandum in

response to our May 3, 2010 Order, it, too, quoted Steffens's

indelible phrase.  Gov't's Mem. Per Order of May 3, 2010

("Gov't's Second Mem.") at 3.

The record also is replete with references to the so-

called "audit" program that DHS maintained over MEBH. DHS's idea

of an "audit" was to give MEBH up to six weeks' advance notice of

the precise date the auditors would arrive, and a few days before

that date it would give MEBH the names of those families to be

"audited". Given that these "audits" were such a charade, it

should surprise no one that the Government reports that:

> In his report of the 2003 audit of MEBH, the
> DHS auditor wrote: "Particularly impressive
> was the persistence shown by SCOH Social
> Workers in ensuring that each seven day
> period had a face to face contact with family
> members. Remarkably, there was only one
> instance where a Formal Alert was required.
> Remarkable, because in thirteen years of SCOH
> reviews I have not witnessed this degree of
> contact regularity."

Gov't's First Mem. at 7, n.7. In light of what we now know was

the reality of MEBH's lackadaisical and haphazard supervision

practices, this DHS auditor's report can only be regarded as

fiction.

Then there was the testimony at trial of the Assistant

Medical Examiner who performed the autopsy on Danieal Kelly. He

reported that after the child's autopsy he, for the first time in

his career, received a direct call from the then-Acting Health

Commissioner. She directed the doctor to "say nothing" about

Danieal Kelly's autopsy "to inquiring people", as if there would

be no public interest in the institutional breakdown that took the child's life.

That DHS's relationship with MEBH was, at best, one of cozy indifference was perhaps most vividly demonstrated in the testimony at trial of Wesley M. Brown, who, at the time of his retirement, was DHS's Program Director for Intake at the Children's and Youth Division, which handled child abuse investigations. On August 4, 2006 -- the day DHS learned that Danieal Kelly's decomposed body was found -- Brown had a jocular conversation with Kamuvaka about DHS's obtaining the Kelly family file. As August 4 was a Friday, Kamuvaka (falsely) claimed to Brown that MEBH's copier was "broke" and therefore she asked if she could bring the Kelly file to DHS on Monday, August 7. Brown recalled "agreeing to that". N.T. of Wesley M. Brown at 119 (Feb. 17, 2010) (hereinafter "Brown N.T."). When asked if he remembered in that conversation "her joking with you at all", he answered that,

> She did. She reminded me that she and I had both been at the University of Pennsylvania together, back 1984 or 1985. She was a doctoral student and I was getting my masters degree.

Brown N.T. at 104.

As it turned out, wiser heads prevailed, and Brown's

superior overruled his accommodation to his former classmate.
Thus, DHS retrieved MEBH's Kelly file from MEBH's office that
afternoon -- albeit after further delay on MEBH's part.  MEBH
faxed the sixty-four fabricated pages later that night.

As we noted in our May 3, 2010 Order, DHS social worker
Laura Sommerer pled guilty to "knowingly endangering the welfare
of a child, Danieal Kelly, by violating a duty of care,
protection or support".  In its response to our second Order, the
Government essentially depicts Sommerer as some kind of lone wolf
at DHS whose crime does not "turn Sommerer, much less the City,
into a co-conspirator with the trial defendants, such that the
City should be prevented from receiving restitution."  Gov't's
Second Mem. at 4-5. But read against the record, the Government's
view seems an odd instance of willful blindness.

In truth, if one reads the factual basis of Sommerer's
plea in the Appendix to this Memorandum against the record
developed before us at trial and thereafter, it seems that the
only fair conclusion one can draw is that not only did <u>she</u> fail
to act, but the entire agency, through its relationship with
MEBH, had "taken action so lame or meager that such actions
cannot reasonably be expected to protect the child's welfare," as
Pennsylvania has described this element of Sommerer's crime.  Far

from being a lone wolf, Sommerer had plenty of company on the

City payroll: (1) her predecessor, Dana Poindexter,[5] (2) Acting

Health Commissioner Carmen Paris, who muzzled Assistant Medical

Examiner Edwin Lieberman,[6] (3) Wesley M. Brown,[7] (4) the high

City official(s) who hired MEBH and protected it for over six

years, (5) the "auditors" who conducted the mock examinations[8]

---

[5] According to the Presentment, on October 8, 2002, Dana Poindexter was assigned "to investigate a complaint about the dismal conditions in which Andrea Kelly's children lived." Presentment at 59. Through the ensuing thirteen pages of the Presentment, the Grand Jury details over three years of Poindexter's inaction regarding the Kelly family in general, and Danieal Kelly in particular. Id. at 59-72. Poindexter's role ended, and Sommerer's began, when the Kelly family was offloaded to MEBH in September of 2005.

[6] Dr. Lieberman testified on cross-examination that Paris was his superior who told Dr. Lieberman "that you were to say nothing about your autopsy [of Danieal Kelly] to inquiring people." N.T. of Edwin Lieberman, M.D. at 62 (Feb. 17, 2010). In affirming that this was "an unprecedented thing" in his career, Dr. Lieberman testified, "It has been the first and, hopefully, the only time." Id. One would have to be Pollyanna to believe that this call was merely the unbidden act of the Acting Health Commissioner.

[7] Interestingly, Brown testified that as a result of his participation in the DHS "investigation" of the death of Danieal Kelly he was suspended for ten days, Brown N.T. at 101, but that there was no suspension for Sommerer. Sommerer received a "counseling session." Brown N.T. 116-17.

[8] As there were at least three such "audits," one may fairly assume that all did not involve the same DHS employees.

and (6) gave MEBH rapturous reviews,[9] and (7) the City

official(s) who after August 4, 2006 chose not to inform HHS of

MEBH's misuse of seven figures of TANF funds -- to name only

some.  To be sure, not all of these City officials are on the

same plane of culpability, as, for example, the active and

sinister obstruction of (2) is more reprehensible than the

passivity of (3).

Reasonable people, therefore, could readily find that

DHS <u>institutionally</u> and systematically had "persisted in unlawful

conduct" that could bar it from being regarded as an MVRA victim.

<u>See</u> <u>United States v. Martinez</u>, 978 F.Supp. 1442, 1450 (D.N.M.

1997).

While the Government concedes that the "questioned acts

of the City employees identified by the Court . . . are certainly

troublesome and warrant sanctions", Gov't's First Mem. at 8, it

contends that the City's status is more analogous to the victim

title insurance company the Seventh Circuit considered in <u>United</u>

<u>States v. Barrett</u>, 51 F.3d 86 (7th Cir. 1995).  In <u>Barrett</u>, the

defendant connived with an employee of the title insurance

company, and the defendant argued that the company should not be

_____

[9] One would expect the actual writers of these reviews to be
different people from those on the scene.

21

regarded as an MVRA victim because the accomplice to the commission of the offense worked for it. The Seventh Circuit held that:

> [C]ommon sense dictates that when an employee acts to the detriment of his employer and in violation of the law, his actions normally will be deemed to fall outside the scope of his employment and thus will not be imputed to his employer.

Id. at 89.

Perhaps anticipating that we could find the City more like Martinez than Barrett -- as we indeed do[10] -- the Government argues that since "the City is a public entity, the true first-line victims in this case are the taxpayers, and there is no just reason to punish them for the bad acts of some City employees." Gov't's First Mem. at 9. Of course, a short answer to the Government's contention might begin with reference to Steffens's use of the word "contented", which the record here demonstrates is no antique. But that reality does not overcome the fact that there are, without doubt, many dedicated public servants in the

---

[10] The Seventh Circuit's reference to "common sense", however, very much applies here. As rehearsed in the text, no application of "common sense" would conclude that DHS's institutional and systemic failure was the product of one bad apple, Laura Sommerer. The City's barrel was palpably full of such apples.

City of Philadelphia, even at DHS.

It is also worth mention that there are stirrings that offer promise that the City is moving away from Steffensonian contentment with the <u>status</u> <u>quo</u> <u>ante</u>. For example, the Government informs us that DHS has actually performed at least one surprise audit of an outside contractor. More substantively, the City has recently created a Community Oversight Board whose members include Dr. Cindy Christian, a pediatrician from Children's Hospital of Philadelphia who is nationally recognized as an expert in abused and neglected children. Dr. Christian's memorable testimony before us leaves no doubt that she is anything but "contented".

And while it is true that, from a number of angles, the City was itself a major actor in this drama, and therefore unquestionably has, as the Trial Defendants argue, "unclean hands", the prior question is whether such equitable doctrines apply at all to the question before us. There is little doubt that the clean-hands doctrine is a child of equity. As a standard definition puts it, the doctrine states

> [t]he principle that a party cannot seek
> equitable relief or assert an equitable
> defense if that party has violated an
> equitable principle, such as good faith. []

> Such a party is described as having "unclean
> hands."

<u>Black's Law Dictionary</u> 286 (9th ed. 2009).

The Restatement (Second) of Contracts reminds us that even unconscionability, usually associated with the quintessentially legal Uniform Commercial Code, is itself rooted in equitable concerns:

> Even though a contract was fully enforceable
> in an action for damages, equitable remedies
> such as specific performance were refused
> where the sum total of its provisions drives
> too hard a bargain for a court of conscience
> to assist.

Restatement (Second) of Contracts § 208, cmt. b (1979) (citations omitted).

Put another way, although in a moral sense the doctrine is certainly pertinent here, the task before us is to construe a federal statute as it applies to the facts of this case in the context of a federal sentencing. That enterprise strikes us as a legal and statutory, and not an equitable, inquiry. This is particularly so where the statute, and its predecessor, "since 1982 all demonstrate a clarion congressional intent to provide restitution to as many victims and in as many cases as possible." <u>Martin</u>, 128 F.3d at 1190.

This problem, as the Government ultimately phrases it, distills to an abiding one that Western experience has faced since ancient times,[11] and that is the issue of whether the good should be penalized because of the bad, even when the unrighteous may be in the majority. Surely our jurisprudence -- and the MVRA in particular -- exists to protect the righteous, whether ten or more conscientious public servants or the thousands of taxpayers -- not all "contented" -- who support them.

Thus, while the issue is by no means free from doubt given the record here, we conclude that the City's status as a "victim" has enough legal heft behind it as to make that status a predicate for the compromise the City has reached with the Government. The City is therefore sufficiently an MVRA victim that it can assign the interest derived from that status to the Crime Victims Fund, as it on April 7, 2010 agreed with the Government.

Amount of Restitution

The questions of whether the loss amount is

---

[11] See, e.g., Genesis 18:23-32 (Abraham's question to God, "Wilt thou also destroy the righteous with the wicked?" and subsequent negotiation over how few righteous were needed to save the city).

ascertainable, and, if so, how much the restitution should be,
need not long detain us.  The MVRA, of course, places the burden
of proof -- "by the preponderance of the evidence" -- "on the
attorney for the Government" when "the amount of the loss
sustained by a victim" is at issue, 18 U.S.C. § 3664(e).

As it turns out, in November of 2001 the Sentencing
Commission in Amendment 617 explicitly overruled our Court of
Appeals's decisions to the effect that the calculus of "loss"
should deduct the fair value of services provided even by those
unlicensed to provide them.  See United States v. Hayes, 242 F.3d
114, 119-20 (3d Cir. 2001), and United States v. Maurello, 76
F.3d 1304, 1312-13(3d Cir. 1996).  See also U.S.S.G. § 2B1.1 and
App. Note 3(F)(v).[12]  Here we know, for example, that every time
intern SCOH worker Alan Speed -- at Kamuvaka's specific direction
-- wrote "BSW" (i.e., Bachelor of Social Work) next to his
signature, he (a) did not have that degree, and (b) did not make

_____

[12] This Note reads, in pertinent part as to the record here,
"In a case involving a scheme in which [] services were
fraudulently rendered to the victim by persons falsely posing as
licensed professionals . . . loss shall include the amount paid
for the . . . services . . . transferred, rendered, or
misrepresented, with no credit for the value of those . . .
services."  Our Court of Appeals, in a non-precedential opinion,
has acknowledged that Amendment 617 "disavowed" Third Circuit
caselaw to the contrary.  United States v. Aronowitz, 151 Fed.
Appx. 193, 194 (3d Cir. Oct. 26, 2005).

the visit.

Even under the former jurisprudence, it is now beyond argument that the City, the Commonwealth and HHS did not get anything close in value to the full $3,650,145.36 they paid to protect these "at risk" children entrusted to MEBH. We know from the testimony of former SCOH workers that phantom visits ranged from as high as 70% (Sokunthea Chan) to 50% (Christiana Nimpson) to 40% (Alan Speed). A SCOH family mother, Ms. Wingard, testified that Murray visited ten times, not the forty-six MEBH's records showed -- a phantom rate of 78%. Other victim mothers and SCOH workers testified, as the jury ultimately found, that phantom visits and faked documentation of them were business as usual at MEBH. The totality of such testimony and findings is far more concrete than what the Trial Defendants decry as "speculation and unsupported conjecture." More to the point, it provides a legitimate basis upon which to approximate the "loss" at MEBH's most unclean hands. Defs' Jt. Resp. at 8.

Thus, under the Application Note the loss would be $3,650,145.36. Under the pre-Amendment 617 Third Circuit jurisprudence, it could range from $2,847,113 (at 78%) to as low as $1,460,058 (at 40%). The Government's proffered $1,216,000

(at 33%) therefore gives the defendants every benefit of doubt, and we shall adopt it for the Trial Defendants -- as we did for the Plea Defendants -- as the "reasonably foreseeable pecuniary harm" contemplated under Application Note 3(A)(iv) to U.S.S.G. 2B1.1.


                              BY THE COURT:

                              __\s\Stewart Dalzell

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA      :  CRIMINAL ACTION

                              :

        v.                 :

                              :

MICKAL KAMUVAKA, et al.     :  No. 09-294-ALL


APPENDIX TO MEMORANDUM OF JUNE 7, 2010


IN THE COURT OF COMMON PLEAS

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH              :

                              :

        vs.               :

                              :

LAURA SOMMERER          :    CP-51-CR-0011633-2008


Room 1105 Criminal Justice Center

Philadelphia, Pennsylvania

        July 15, 2009


Before: The Honorable Benjamin Lerner, J.

NONTRIAL


Jennifer Venneri, RPR

Official Court Reporter


Transcript of Guilty Plea

July 15, 2009

THE COURT: Ms. Sommerer, is it your decision today that you want to give up your right to trial in this case once and for all and enter a guilty plea to this endangering charge?

THE DEFENDANT: Yes.

THE COURT: Is that a free and voluntary decision on your part?

THE DEFENDANT: Yes.

THE COURT: I need you to listen very carefully while Mr. McCann [the Assistant District Attorney] summarizes the facts that he would be trying to prove if this case were going to trial.  When he's finished, I will have a few more questions to ask you.

MR. MCCANN: May I, Your Honor?

THE COURT: Yes.

MR. MCCANN: Thank you.

Your Honor, Ms. Sommerer was assigned to Danieal Kelly's family, the family of Andrea Kelly and her children, on October 4, 2005.  But this assignment stemmed from a general protective services report that was called into the DHS hotline on September 3, 2005 alleging neglect of Danieal and her siblings, educational neglect and medical neglect.  As a result of that report, another worker agreed that the family should get SCOH services, Service To Children In Their Own Home, and then Ms. Sommerer was assigned to that case in October, October 4th of 2005.

Essentially, the goal was to make sure that Danieal get medical care, was enrolled in school and was connected to services for her cerebral palsy and that the family would be moved to suitable housing.  That's among the goals that were set forth for the family.

Obviously, ten months after Ms. Sommerer was assigned to this case on August 4, 2006, Danieal Kelly died. She died in that home on Memorial Avenue, 1722 Memorial Avenue in Philadelphia.

The Commonwealth will just mark the photographs of Danieal at that time, the autopsy photographs, and make them part of the record. The Court has already seen them many times. There's no need to belabor that issue but it needs to be part of the record.

THE COURT: They can be marked -- how many photographs are there?

*          *          *

[Court admits exhibits without objection]

*          *          *

MR. MCCANN: Now, briefly, Your Honor, I'm just going to quote some portions of the Grand Jury report and the presentment.

Ms. Sommerer's responsibility also was to monitor the provider agency, Multi-Ethnic Behavioral Health, to make sure that the services that were supposed to be provided to Danieal and the other children were provided. Right from the beginning of this case, the assigned SCOH worker was a student intern from Multi-Ethnic.

At the first -- at a meeting on January 12, 2006, three months into Multi-Ethnic's work with the family, it was known that Danieal was still not enrolled in school, no progress had been made on medical appointments, not even to schedule them. Essentially, the list of tasks that Ms. Sommerer wrote on that day were the same that were part of the reason why SCOH services were instituted in September of 2005.

Three months into the contract with Multi-Ethnic, not one doctor's appointment had been scheduled for any of the children, no progress had been made in getting Danieal into school, and there was no movement on the housing issue either. The doctors appointment for Danieal was finally scheduled in

March of 2006.  This appointment was scheduled for May 9, 2006.
In the March 27th meeting that Ms. Sommerer had with the family,
it was not noted that there was a SCOH worker that was leaving or
when a new one was going to start.  In fact, evidence later
showed to the Grand Jury that the family had no SCOH worker for
long periods of time, for at least four or five weeks in the
spring of 2006.  In an e-mail from Ms. Sommerer to Alan Speed on
April 18, 2006, she -- it indicated that she was unaware that he
was no longer the worker even though he hadn't been in the house
at that point for at least a month.

        In terms of the doctors appointment on May 9th of 2006,
it was missed.  Ms. Sommerer did not know about this until June
29, 2006, which the [sic] is the last time she visited the house
before Danieal died.  She had never made any contact with the
SCOH worker of the victim's family between May 9th and June 29th
of 2006 to see if the appointment was made.  Then even after
finding out about the missed appointment at the visit on June 29,
2006, she did not -- she admittedly did not take any steps to
reschedule schedule [sic] the appointment or have the SCOH worker
reschedule the appointment.

        At that meeting on June 2, 2006, not one of the
objectives spelled out in the initial family service plan six
months earlier had been achieved.  At that point, Danieal still
had not seen a doctor, had not been enrolled in school and was
not connected to any services for her disability.  On the June
29th visit to the Kelly home when she was supposed to check on
the safety of the children, Ms. Sommerer, according to her own
testimony, did not even walk into the room where Danieal laid in
bed.

        I'll just quote some of her testimony concerning the
ten months that she was Danieal's social worker.  This is
testimony before the Grand Jury.


        "QUESTION: The five times you were in that house, did
you ever see Danieal in the house anywhere other than in the room
where you saw her the first time?

        "ANSWER: No.


        "QUESTION: Did you ever see her anywhere other than in
the bed in that room or in the wheelchair?

"ANSWER: No.


"QUESTION: Did you ever, any of the five times you were in the house, try to speak or talk to Danieal or communicate with her in any way?

"ANSWER: Maybe to say hi, that kind of thing, not more.


"QUESTION: Did you ever see the mother speak to her during these visits?

"ANSWER: I don't think so. I mean, I don't -- I would say, no.


"QUESTION: And --

"ANSWER: She may. I mean, there may have been a few words exchanged when we would go into the room to see Danieal, that kind of thing but. you know, nothing significant.


"QUESTION: Did you ever try to talk to her, try to engage her in conversation or try to communicate with her in any way?

"ANSWER: When I went to talk to her, you know, her mother did tell me that she did, you know, prefer -- that Danieal's not perceptive to that. And, no, not more than saying hi to her, that kind of thing."


I should note, Your Honor, that from the beginning of the case in September, when the intake worker assessed risk to the family in September of 2005, that Danieal was assessed at high risk, that the SCOH services called for the worker, the SCOH worker going to the house two times a week, and that after the June 29, 2006 visit, Ms. Sommerer did not visit the home.

I would also note that Naomi Washington, Danieal's grandmother, would testify that the last time she saw Danieal was approximately June 11th at the birthday of one of her other granddaughters in a party at the family's Memorial Avenue home. She had not seen her granddaughter in some time and was shocked by the child's appearance. When Danieal looked up at her, she

noticed her collar bone, saw how much weight she lost.  She noticed her emaciated legs and noted that Danieal had shrunken so that she was quite small.  She was very alarmed by Danieal's weight loss and told her daughter to take the child to the hospital, which, of course, Andrea Kelly, the child's mother, did not do.

We would also note the testimony before the Grand Jury of Dr. Linda Gallison, who was in the Kelly family home in June of 2006 to do school testing for Danieal to get her into school. She testified to the Grand Jury that when she put her hand around Danieal's forearm, it was just bone.  She described both Danieal and the house as sort of dirty.

\*                   \*                   \*

MR. MCCANN: Your Honor, the sum and substance of the evidence would obviously be more extensive than that, but that would be a brief summary of what the Commonwealth would prove had Ms. Sommerer gone to trial.

THE COURT: Thank you.

MR. MCCANN: One other thing, Your Honor.  The provider agency, Multi-Ethnic, was supposed to provide two quarterly reports to DHS during the time period that Ms. Sommerer monitored the case, and neither of those reports were reported, nor did Ms. Sommerer tell anybody from DHS that they were not.  Finally, there was another family service plan that was supposed to be complete on June 29, 2006.  It was not submitted until after Danieal died on August 4, 2006.

THE COURT: Thank you, Mr. McCann.

Ms. Sommerer, did you hear and understand the summary of the allegations that Mr. McCann just read?

THE DEFENDANT: Yes.

THE COURT: That summary contains all of the elements of the offense which you have indicated you want to plead guilty. To put that another way, if you were going to trial and if the Commonwealth introduced evidence regarding all of those allegations and if that evidence just summarized by Mr. McCann was accepted as true by the judge or jury trying the case, that evidence would be sufficient to prove this charge against you beyond a reasonable doubt.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: For purposes of this proceeding today, do you accept these allegations?

THE DEFENDANT: Yes.